**LAME, Anthony, Appellant,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Appellee.**

No. 80–2458.

United States Court of Appeals, Third Circuit.

Argued March 24, 1981.

Decided July 16, 1981.

Rehearing and Rehearing In Banc Denied September 25, 1981.

Samuel E. Klein (argued), Katherine Hatton, Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., for appellant.

Susan Dein Bricklin, Asst. U. S. Atty. (argued), Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Section, Philadelphia, Pa., for appellee.

Before ADAMS and GARTH, Circuit Judges and DUMBAULD, District Judge.*

## OPINION OF THE COURT

GARTH, Circuit Judge.

Anthony Lame appeals from the district court's entry of summary judgment for the United States Department of Justice in his action under the Freedom of Information Act. The district court held that the complete text of all the documents that Lame sought were exempt from FOIA disclosure. We hold that the district court did not utilize proper procedures in determining which documents or which portion of documents were exempt. Thus, its ruling based on inadequate submissions cannot be sustained. Accordingly, we reverse and remand.

### I.

Anthony Lame, the manager of an investigative reporting unit for a television station, planned to write a book concerning the "new" FBI. The book was to focus on the successful federal prosecution of Representative Herbert Fineman and Senator Henry J. Cianfrani, both former members of the legislature of the Commonwealth of Pennsylvania.[1] On November 10, 1978 Lame requested access to the files that the United States Department of Justice maintained on the two prosecutions. Thereafter, he narrowed his request to include only Federal Bureau of Investigation FD–302 Forms ("forms utilized by the FBI to record information which may later become testimony" Toole affidavit, App. at 125a) reflecting interviews with individuals who, for the most part, he named.[2]

The FBI answered that it was unable to respond until Lame obtained and submitted notarized authorizations of the individuals whose FD–302s he sought. Lame refused to submit authorizations. Instead he demanded that the FBI rule on his request without them. The FBI informed Lame on March 7, 1979 that all the materials he sought were exempt from disclosure under 5 U.S.C. §§ 552(b)(7)(C) (unwarranted invasion of privacy exemption) and (7)(D) (confidential source and confidential information exemption).[3] Lame took an administrative appeal to the Department of Justice, but the Office of Privacy and Information Appeals of that department affirmed the FBI's initial decision.

Lame then filed a complaint in the United States District Court for the Eastern District of Pennsylvania on November 7, 1979, seeking the release of the requested documents. Subsequently, Lame filed three sets of Interrogatories and two Requests for Production of Documents.

The government refused to supply any of the information Lame was seeking. Accordingly, Lame moved to compel discovery and the FBI moved for a protective order. The district court did not rule on either of these motions.

Both Lame and the government then filed motions for summary judgment. Attached to the government's motion was an affidavit of FBI Special Agent Daniel Toole (App. at 122a). Toole refused to confirm or deny the existence of the FD–302s sought by Lame, and set forth his reasons why he believed the information sought was exempt.

---

\* Honorable Edward Dumbauld, United States District Judge for the Western District of Pennsylvania, sitting by designation.

1. Fineman was charged with mail fraud, obstruction of justice, obstruction of a criminal investigation, and interstate racketeering, and was convicted on two counts of obstruction of justice. Cianfrani was charged with mail fraud, obstruction of justice, interstate racketeering and income tax evasion. He entered pleas of guilty or *nolo contendere* on all counts. The government produced evidence of various types of political corruption, including evidence

of pay-offs made to obtain political influence that would help assure admission to medical and other professional schools.

2. Lame also requested all 302s regarding "all other officials of *Jefferson Medical College*" and "all other State Legislators and/or state officials" that were in the Fineman file and all 302s regarding "[a]ny other officials of [the] University of Pennsylvania" in the Cianfrani file.

3. For the text of these exemptions, *see infra*.

Lame submitted an affidavit with his motion for summary judgment. He explained that he had compiled the list of individuals whose 302s he desired by having reviewed the transcript of the trial of Representative Herbert Fineman and the related prosecution of Martin Abrams, and by having examined the Change of Plea Memorandum filed in the Senator Henry J. Cianfrani prosecution. A copy of the Cianfrani Change of Plea Memorandum was appended to Lame's affidavit. Lame's memorandum of law essentially maintained that since most of the information he sought was already public, the privacy and confidentiality exemptions should not preclude disclosure.

After oral argument the district court found this record inadequate on which to decide the summary judgment motions, and on June 24, 1980 granted the government thirty days in which to supplement the record.

The government then submitted an *in camera* affidavit to which several 302 forms were attached.[4] The *in camera* affidavit repeated the government's legal claims of exemption under §§ 552(b)(7)(C) and (7)(D). The affidavit also discussed in general terms the FBI's position that disclosure would invade the privacy of named individuals, as well as the privacy of third parties mentioned. It claimed that in order to obtain the 302 interviews, assurances either express or implied, had been given to the interviewees that there would be no indiscriminate release to the public of their identities. The affidavit then specifically discussed the sample 302s attached to the affidavit.

On this record, the district court granted summary judgment for the government. The court first treated the privacy exception, balancing the public interest in learning about FBI techniques, against the embarrassment, harassment, and risk to personal safety that revelation of an interviewee's role might cause. The district court found it "highly relevant" that the material

sought by Lame, or its equivalent, was to a large degree available by other means. It concluded that the privacy interests outweighed the public interest in disclosure and accordingly held that the 7(C) exemption was "properly asserted".

The district court next held that the 7(D) confidential source exemption was also applicable. The court failed to find whether the FBI had made express assurances of confidentiality or whether under the circumstances, assurances of confidentiality could reasonably be inferred. *Maroscia v. Levi*, 569 F.2d 1000, 1002 (7th Cir. 1977). On the record before it, the district court held that the government had met its burden of proving that the requested material was exempt from production.

Lame appeals, arguing that the procedure utilized by the district court was improper, and that the district court had erred in finding that the privacy and confidentiality exemptions were applicable. The government responds that the material sought was uniformly exempt, and accordingly that the procedure followed by the district court was proper because any further disclosure would reveal exempt information.

## II.

We turn first to an examination of the basic procedures to be used in Freedom of Information Act cases. We also examine the nature of the Section 7(C) and (D) exemptions in order to determine the merits of Lame's claim that the procedure employed by the district court were improper.

## A.

Underlying the Freedom of Information Act, as we recently noted in *Coastal Gas Corp. v. Department of Energy*, 644 F.2d 969 (3d Cir. 1981), is a belief that "an informed electorate is vital to the proper operation of a democracy." *Id.*, at 974, quoting S.Rep.No.813, 89th Cong., 1st Sess. 3 (1965). Upon an appropriate FOIA request, federal agencies are therefore required to

4. Both the district court and this court examined that affidavit and attachments, but no disclosure of their contents has been made to Lame.

release promptly the information requested that is in their possession, subject to nine statutory exemptions. If the agency has failed to release the requested information, and administrative appeals have been exhausted, the individual seeking disclosure can obtain review of the agency's denial in a federal district court. Review is *de novo* and the Act places the burden of establishing that the requested materials are exempt from disclosure upon the agency. 5 U.S.C. § 552(a)(4)(B). Any reasonably segregable, non-exempt portion of a record is to be made available to the person requesting that record. *Id.*

The District of Columbia Circuit has developed FOIA procedures designed to allow informed adversarial argument, promote efficient judicial review at both the trial and appellate levels, and discourage conclusory claims of exemption. In the ordinary case, the agency must provide a detailed public justification for its claims of exemption. This justification must be accompanied by an index that "would correlate statements made in the Government's refusal justification with the actual portions of the document." *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C.Cir.1973) *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1979). There is support for the *Vaughn* procedures in the legislative history, *see* S.Rep. No. 93–854, 93d Cong. 2d Sess. 15 (1974) and they have been adopted by our court, *see Ferri v. Bell*, 645 F.2d 1213, 1222 (3d Cir. 1981); *Coastal States Gas Corp. v. Department of Energy*, 644 F.2d 969 (3d Cir. 1981). After the legal and factual issues in dispute have been put in focus by this procedure, the district court may still have to engage in an *in camera* inspection to determine whether the "records or any part thereof shall be withheld." 5 U.S.C. § 552(a)(4)(B) (1976). *See Ferri v. Bell, supra*, 645 F.2d at 1222.

In an unusual case the agency may not be able to provide the detailed index which *Vaughn* requires because such an index could reveal the very information that the agency claims is protected from disclosure. The agency, however, must still provide a "public affidavit explaining in as much detail as possible" the basis for the claimed exemption. *Phillippi v. Central Intelligence Agency*, 546 F.2d 1009, 1013 (D.C.Cir.1976). Obviously, the *in camera* procedure assumes greater importance when the public affidavit relies on generalities and provides little detail.

In *Phillippi* the requester sought records concerning the efforts of the CIA to convince the news media to withhold publishing their knowledge of the *Glomar Explorer* project. The CIA claimed it could not admit or deny the existence of the records sought because any connection of the CIA with the *Glomar Explorer* was itself exempt information. The district court granted summary judgment for the government based on two *in camera* affidavits along with a public affidavit by the CIA which was filed in support of the CIA's motion to have all material related to the case submitted to the court *in camera*. The Court of Appeals held that in the peculiar context of that case, where the government could neither confirm nor deny the existence of the documents, the use of *in camera* affidavits was proper. The court cautioned that before the district court should resort to the *in camera* examination, it should first:

> require the Agency to provide a public affidavit explaining in as much detail as is possible the basis for its claim that it can be required neither to confirm nor to deny the existence of the requested records. The Agency's arguments should then be subject to testing by appellant, who should be allowed to seek appropriate discovery when necessary to clarify the Agency's position or to identify the procedures by which that position was established. Only after the issues have been identified by this process should the District Court, if necessary, consider arguments or information which the Agency is unable to make public.

*Id.* at 1013 (footnote omitted).

The *Phillippi* court then remanded to the district court because the appellant had not been given an opportunity to engage in appropriate discovery, and because the pub-

lic affidavit had been prepared for another case, not for *Phillippi*. We approved the *Phillippi* standard in *Ferri*:

> And if the agency is unable to articulate publicly the specific disclosure it fears and the specific harm that would ensue, then in camera inspection of a more detailed affidavit must be resorted to. *See Phillippi v. Central Intelligence Agency, supra*, 546 F.2d at 1013.

*Ferri*, 645 F.2d at 1224.

In sum, under ordinary circumstances a *Vaughn* index correlating justifications for non-disclosure with the particular portions of the documents requested, will generally suffice to narrow the disputed issues and permit a reasoned disposition by the district court. In a special circumstance such as the one presented by *Phillippi*, the public response by the government may of necessity be limited to an argument as to why no detailed information may be provided publicly. Such a response will alert the requester and the court to the bases on which the government is resisting disclosure so that, at the least, the government's theory may be contested by the requester. In both the ordinary and the exceptional case, *in camera* affidavits and submissions are authorized and the district court may resort to them in arriving at its ultimate determination. In both instances, the district court must have furnished to it, in whatever form, public or private, all of the detailed justifications advanced by the government for non-disclosure. The government must also give the court an opportunity to review all the materials which the government claims to be exempt, even though the decision whether to inspect these materials rests with the district court.

### B.

The government asserts that all the information which Lame requests is exempt from disclosure under 5 U.S.C. §§ 552(b)(7)(C) and (b)(7)(D).

Sections (b)(7)(C) and (b)(7)(D) make exempt from disclosure:

> (7) investigatory records complied for law enforcement purposes, but only to the extent that the production of such records would ... (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source ....[5]

The Section 7(C) privacy exemption does not prohibit all disclosures which invade personal privacy, but only disclosures which entail an unwarranted invasion of personal privacy. The privacy protected is not only that of the confidential source, but also the privacy of third parties whom the confidential source has revealed. We discussed the privacy exemption in *Ferri*:

> However, we do not read *Masonic Homes* as standing for the principle that once a law enforcement proceeding has been completed, the compiled records lose their protection because the proceeding is no longer pending. It only supports the view that a mere hypothetical possibility of a future enforcement proceeding is not sufficient to treat records as law enforcement records when there is no pending, *and has been no prior*, enforcement proceeding. *See Ferri v. Bell, supra*, 645 F.2d at 1223. It has not been questioned that "[e]xemption 7 is not rendered unavailable by the termination of the active investigation relating to these documents." *Pope v. United States*, 599 F.2d 1383, 1387 (5th Cir. 1979). We assumed the validity of this principle in *Ferri v. Bell, supra*, 645 F.2d at 1217.

---

**5.** It is not contested that the records requested by Lame were investigatory records compiled for law enforcement purposes under § 552(b)(7) as well as records compiled by a criminal law enforcement authority in the course of a criminal investigation. *See* § 552(b)(7)(D).

In *Committee on Masonic Homes v. NLRB*, 556 F.2d 214 (3d Cir. 1977) we wrote that union authorization cards were not records compiled for law enforcement purposes. We stated that: [w]e think 'law enforcement purposes' must relate to some type of formal proceeding, and one that is pending.[6]

[6] The NLRB argues that the cards may well be used in some future unfair labor practice proceeding.

That is not enough. If it were, nearly all NLRB records could fit this definition.

Exemption 7(C)'s protection of personal privacy is not absolute. As the trial court recognized, the proper approach to Ferri's request under a privacy-based exemption such as section 7(C) is a de novo balancing test, weighing the privacy interest and the extent to which it is invaded, on the one hand, against the public benefit that would result from disclosure, on the other. *Committee on Masonic Homes of the R.W. Grande Lodge v. NLRB*, 556, F.2d 214, 220 (3d Cir. 1977). *See also Department of Air Force v. Rose*, 425 U.S. 352, 373 [, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11] (1976); *Wine Hobby USA Inc. v. IRS*, [502 F.2d 133, 135 (3d Cir. 1974)]; *Tennessean Newspaper, Inc. v. Levi*, [403 F.Supp. 1318 (M.D.Tenn. 1975)].

645 F.2d at 1217.

In *Lamont v. Department of Justice*, 475 F.Supp. 761, 776–77 (S.D.N.Y.) (footnote omitted), it was stated that the 7(C) exemption:

> protects against the disclosure of the identity of individuals where such disclosure would likely cause embarrassment or harassment to the third party, either because sensitive, derogatory, or intimate personal information about him or her is contained in the file *or* because the person's cooperation with an FBI investigation would itself prove embarrassing.

In examining a privacy exemption, information given by testimony at trial or in other public proceedings achieves relevancy because the circumstances under which such testimony is given may indicate that the individual's privacy interest is substantially less compelling than might otherwise be assumed.

■ There can be no question that the 7(C) balancing test must be conducted with regard to each document, because the privacy interest and the interest of the public in disclosure may vary from document to document. Indeed these interests may vary from portion to portion of an individual document.[6]

■ Unlike the Section 7(C) privacy exemption, the Section 7(D) exemption does not require any balancing. If the information would reveal the identity of a confidential source, or confidential information given only by a confidential source, the information may be withheld without any consideration of the public interest. *See Sands v. Murphy*, 633 F.2d 968, 971 (1st Cir. 1980); *Lesar v. United States Department of Justice*, 636 F.2d 472, 492 (D.C.Cir.1980); *see also Church of Scientology. v. United States Department of Justice*, 612 F.2d 417 (9th Cir. 1979); *Terkel v. Kelly*, 599 F.2d 214 (7th Cir. 1979). *But see Nix v. United States*, 572 F.2d 998, 1002 (4th Cir. 1978).

■ Section 7(D) provides two protections. It protects from disclosure: (a) "the identity of a confidential source" and (b) for a criminal law investigation, "confidential information furnished only by a confidential source," *see Duffin v. Carlson*, 636 F.2d 709, 712 (D.C.Cir.1980). A person is a confidential source "if the person provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." S.Rep.No. 1200, 93d Cong., 2d Sess. 13 (1974) U.S.Code Cong. & Admin. News, 6267, 6291 (Conference Report), *reprinted in Freedom of Information Act and Amendments of 1974* (P.L. 93–502), *Source Book: Legislative History, Texts and Other Documents at 230* (Joint Comm. Print 1975) (hereinafter "Source Book"). Whether there is an expressed or implied assurance of confidentiality is a question of fact to be determined in regard to each source. *See Keeney v. Federal Bureau of Investigation*, 630 F.2d 114, 119–120 (2d Cir. 1980); *Deer-*

---

**6.** We are not persuaded by the government's argument that there exists a *per se* rule that the mere connection of an individual with a criminal investigation, constitutes an unwarranted invasion of his privacy. *See Common Cause v.*

*National Archives & Records Serv.*, 628 F.2d 179, 184 (D.C.Cir.1980); *Congressional News Syndicate v. United States Dept. of Justice*, 438 F.Supp. 538, 543–44 (D.D.C.1977).

*ing Milliken, Inc. v. Irving*, 548 F.2d 1131, 1137 (4th Cir. 1977).[7]

■ Once it has been determined that a source is confidential, *all* information that source has provided is exempt from disclosure under the second part of the exemption. A plain reading of the statute ("confidential information furnished only by the confidential source") might lead one to expect that non-confidential information that would not reveal the identity of the confidential source could be disclosed. Moreover, the use of the word "only" might suggest that if the information was provided by a non-confidential source, the identical information provided by a confidential source would not be exempt. However, such interpretations are not supported by the legislative history and case law.

The present language of § 552(b)(7) was added by amendment in 1974. The original amendment to this section as then proposed by Senator Hart and as passed by the Senate, protected investigatory law enforcement records to the extent that production of such records would "disclose the identity of an informer ..." [8] 120 Cong.Rec. 17033 (1974) reprinted in Source Book at 332. However, the final amendment of the statute as enacted protected from disclosure, not only information that would reveal the *identity* of a confidential source, but also information provided by a confidential source. *See Keeney v. Federal Bureau of Investigation*, 630 F.2d 114; *Lesar v. United States Dept. of Justice*, 636 F.2d 472, 488–91 (D.C.Cir.1980); and *Church of Scientology of California v. United States Dept. of Justice*, 612 F.2d 417 (9th Cir. 1979) for a fuller description of the legislative history.

The Conference Report in referring to records compiled by a criminal law enforcement authority states that "*all* of the information furnished only by a confidential source may be withheld if the information was compiled in the course of a criminal investigation." [emphasis in original] Source Book at 230. In this connection Senator Hart stated that "the agency not only can withhold information which would disclose the identity of a confidential source, but also can provide blanket protection for any information supplied by a confidential source." 120 Cong.Rec. 36871 (1974) reprinted in Source Book at 451. Senator Robert Byrd remarked: "The language [of 552(b)(7)] has also been broadened substantially to protect from disclosure all of the information furnished by a confidential source to a criminal law enforcement agency if the information was compiled in the course of a criminal investigation." Source Book at 468. Likewise, Senator Kennedy, the Senate Conference Committee Chairman and Chairman of the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, explained that the bill "provided that there be no requirement to reveal not only the identity of a confidential

---

7. In the debate on the final version of the 1974 amendments to the Act, Senator Hart, who introduced the original amended version of Exemption 7, stated that "all the FBI has to do is to state the information was furnished by a confidential source and it is exempt." 120 Cong.Rec. 36871 (1974). We do not construe this statement to mean that a court must automatically defer to the FBI's characterization of a source. Nor have any other courts taken Senator Hart's statement literally. As the Conference Report, discussed in text *infra*, indicates, a court must determine whether there has been an implied or express assurance of confidentiality. *See, e. g., Keeney v. Federal Bureau of Investigation*, 630 F.2d 114 (2d Cir. 1980); *Maroscia v. Levi*, 564 F.2d 1000, 1002 (7th Cir. 1977).

8. In full, the proposed amendment to Section (b)(7) read:

Section 552(b)(7) is amended to read as follows:

"Investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication or constitute a clearly unwarranted invasion of personal privacy, (C) disclose the identity of an informer, or (D) disclose investigative techniques and procedures."

This section prior to 1974 exempted from disclosure only "investigatory files compiled for law enforcement purposes except to the extent available by law to a private party." Pub.L. No. 89–487, 80 Stat. 251 (1966).

source, but also any information obtained from him in a criminal investigation." Source Book at 459.

These legislative developments led the District of Columbia Circuit to write in *Lesar v. United States Dept. of Justice*, 636 F.2d 472 (D.C.Cir.1980):

> Exemption 7(D) differs from other FOIA exemptions in that its applicability depends not on the specific factual contents of a particular document; instead, the pertinent question is whether the information at issue was furnished by a "confidential source" during the course of a legitimate criminal law investigation. Once that question is answered in the affirmative, all such information obtained from the confidential source receives protection.

*Id.* at 492 [footnotes omitted].

*See also Keeney v. Federal Bureau of Investigation*, 630 F.2d 114, 119 n.2 (2d Cir. 1980).

■ Since all the information given by a confidential source is exempt, it follows that the release of a portion of such information does not lift the blanket exemption. Courts have consistently held that the subsequent disclosure of information originally given in confidence does not render non-confidential any of the information originally provided. *See Keeney, supra*, 630 F.2d at 119 n.2, *Lesar, supra*, 636 F.2d at 491; *Scherer v. Kelley*, 584 F.2d 170, 176 n.7 (7th Cir. 1978), *cert. denied*, 440 U.S. 964, 99 S.Ct. 1511, 59 L.Ed.2d 778 (1979). Therefore once there has been an expressed or implied assurance of confidentiality, a subsequent release or publication by the government of a portion of the information does not negate the exemption for any of the information originally given.[9]

Nevertheless, information which is subsequently disclosed, such as by the source's testimony at trial, may be evidence of the fact that there has been no assurance of confidentiality given by the government. If a source expects that he will, at some later date, publicly testify regarding the information he has provided, it may be difficult to imply an assurance of confidentiality, despite the possible sensitive nature of the information given.

### C.

The issue then confronts us whether, taking into account the nature of the exemptions claimed, the procedure employed by the district court in the instant case was correct where the FBI claimed it could neither admit nor deny the existence of the requested interview forms for fear of breaching confidential relationships or invading privacy interests.

FBI Special Agent Daniel Toole prepared and executed the FBI's initial affidavit, which was a matter of public record in this case. This affidavit did no more than state the general basis of the FBI's objections to providing the information that was requested. Toole asserted that individuals who furnish information to the FBI do so with the understanding that the information given by them and their relationship with the agency will be held in the strictest confidence. According to Toole, without a notarized authorization from these individuals, the FBI will presume that the individual expects that the information he has given will not be released, and the FBI will use the privacy and/or confidentiality FOIA exemptions to prevent disclosure. In response

---

**9.** In answer to the argument that information contained in an agency's files can no longer be regarded exempt as confidential because the source has relinquished his confidentiality by testifying, Judge Swygert, writing for the court in *Scherer v. Kelley*, 584 F.2d 170, 176 n.7 (7th Cir. 1978), *cert. denied*, 440 U.S. 964 (1979), wrote:

> Because a person may have given testimony at a trial on a specific topic does not mean that all information offered by that source

upon a guarantee of confidentiality automatically becomes available to the person to whom it relates. The nontestimonial information may be far more damaging than any testimony freely given and may place the source in great peril. A source would be unlikely to testify on any subject if he or she know that by so doing every transcription made by an investigative agent regarding their conversations could be released to the party about whom the source was informing.

to Lame's contention that the identities of the informants and the contents of their information had already been disclosed. Toole stated that:

However, it is not clear that the FBI is in a position to determine from a review of its files exactly what information which might exist is or is not a matter of public knowledge. Consequently, to confirm or deny the existence of certain FD–302s by affording plaintiff access to them without knowing whether the fact of an individual's involvement in an FBI criminal investigation is a matter of public knowledge would in and of itself constitute an invasion of personal privacy and a breach of a confidential relationship. Furthermore, should FD–302s responsive to plaintiff's request be located, and should it be possible to determine that the individuals noted in the FD–302s have testified in a public judicial proceeding, or have in some other way made a matter of public knowledge the fact they were in contact with the FBI concerning a criminal investigation, the fact remains that the document may contain information that is not a matter of public knowledge. Because an individual's cooperation with the FBI concerning a particular criminal investigation may, by whatever means, have become known to the public, it does not follow that *all* information furnished by the individual under an express or implied assurance of confidentiality contained in an FD–302 is available for release to an FOIA requester. It is quite possible that an FD–302 concerning such an individual would contain information very little, or perhaps even none, of which has been publicly testified to by the source. Individuals would be inhibited in furnishing information to the FBI if they came to believe that a transcript of everything they said to an investigating FBI Agent during the course of a conversation, regardless of whether the information is intended to be the substance of public testimony, could be released to an FOIA requester. The nonpublic information furnished by a source may have been even more significant in aiding the FBI

in its investigations than the information which the source is publicly known to have furnished. Revelation of such nonpublic information would place the source in danger of just the types of possible criticism, public harassment, social ostracism, or even physical injury the privacy and confidentiality exemptions of the FOIA are designed to prevent.

Toole added that the privacy of third parties mentioned in the FD–302s also had to be protected.

The district court as noted previously, found Toole's public affidavit to be inadequate, and the FBI then filed an *in camera* affidavit to which was attached certain sample FD–302 forms. This was the first record admission by the FBI that any of the requested 302 forms existed.

The FBI argued that the information recorded in the FD–302s would never have been given by the particular source without an implied promise of confidentiality and that the privacy rights of the many individuals mentioned in the forms would be compromised by release. The *in camera* affidavit, however, did not discuss to what extent identities of the sources and the information contained in the FD–302s had already been disclosed at Fineman's trial and in the Cianfrani Change of Plea Memorandum or the effect on the FBI's position of any disclosure made at the Fineman and Cianfrani proceedings. Indeed, the FBI has yet to admit that the testimony at trial or the information contained in the Change of Plea Memorandum is related to the FD–302s which it may possess, or whether it possesses all the FD–302s which Lame has specifically requested. On this record, the district court granted summary judgment for the government.

The government acknowledges, as it must, that the affidavits it produced, both on the public record and *in camera*, did not meet the *Vaughn* standards. Nevertheless, the government contends that the procedures utilized by the court were proper. It asserts that the public affidavit it provided was as detailed as the unique circumstances would permit. *See Phillippi, supra.* Ac-

cording to the government, to reveal whether any documents existed and to provide any further description or information concerning these documents, would entail releasing information that was exempt from disclosure under the Act. The *in camera* affidavit procedure employed, it maintains, was sanctioned by *Phillippi*. The government concludes that the public record it produced allowed for informed adversarial debate, and that the entire record permitted informed judicial review.

■ We agree with the government that a *Vaughn* index could not be employed in this case. Once the government admitted to possessing interview forms with any of these informants, it would be revealing the very information it claimed to be exempt— the identities of confidential sources.[10] And since all information provided by a confidential source is exempt, the possibility exists that even the most cursory description of the contents of the interview form would, if the source was confidential, reveal protected information. Such a description might also indirectly disclose the identity of the source.

We recognize that Lame, even though he has information obtained from the Fineman trial and the Cianfrani Change of Plea Memorandum, has no basis for establishing that the individuals named in those proceedings have in fact been interviewed by the FBI, and their interviews recorded on 302 forms. We also recognize that in the peculiar context of this case, the government will not reveal the identity of those individuals for whom it has 302s, and thus provide the nexus between Lame's information which was derived from court proceedings and the information contained in the FBI records. It was in this posture that the district court reviewed the original public affidavit filed by Toole. Two conclusions can be drawn from that affidavit: (1) it cannot be said that Toole's assertion that the FBI's sources will have their privacy

invaded and that these sources are all confidential sources is wholly without merit; and (2) in the absence of more definitive and specific information, particularly with respect to the Fineman and Cianfrani proceedings, the required exemption findings by the district court could not be made. We are satisfied that the FBI's public affidavit was sufficient to meet the *Phillippi* standard as expressed in *Ferri*. Thus, the district court did not err in not requiring a further public articulation nor did it err in proceeding to an examination of the FBI's *in camera* submission.

Had the government in response to the district court's order filed an affidavit which, though in an *in camera* form, was as extensive as the public explanation required under *Vaughn*, the district court would have had before it the necessary ingredients to rule on the exemptions claimed, and we then would have been in a better position to review those rulings. However, the *in camera* affidavit does not meet the *Vaughn* requirements. The government in its *in camera* submission filed no more than a sampling of the FD–302s from the Cianfrani and Fineman files. The 302s were attached to an affidavit explaining why the government believed these documents to be exempt from disclosure. The government did not discuss the impact of the disclosures made at the Cianfrani and Fineman proceedings with respect to individual privacy concerns or with respect to any express or implied assurances of confidentiality that may have been given. Moreover, the government has also now admitted that other requested 302s were not filed with, or discussed in the *in camera* affidavit. The affidavit itself gives no information about whether 302s exist for the individuals, named either specifically or those included within the specified categories, see n.2, *supra*, by Lame. We can only surmise from the manner in which the government's *in camera* submission was made, that the government regards the submitted 302s and

---

**10.** The FBI's position that it could not even admit or deny the existence of FD–302s distinguishes this case from those cases where the thrust of the exemption was directed only to

the contents of particular documents. Thus, in this case even the use of codes would be inconsistent with the position taken by the government.

their accompanying explanations as representative of all the 302s in the FBI's files. The government's argument would proceed: if these submitted documents are exempt, then, all the documents are exempt.

We do not accept this argument and we cannot approve the procedure utilized by the district court, even in a case such as this one where the threshold issue with which the court must contend, is the government's inability to confirm or deny the existence of the documents sought by the requester Lame. Each document and its asserted exemption must be individually explained in terms of privacy or confidentiality.

As earlier explained, the Section 7(C) privacy exemption requires a balancing test in which the privacy interest and the extent to which it is invaded, is balanced against the public benefit that would result from disclosure of each segment of the document. Here, the district court should not only have had the relevant 302s available to it if it desired to refer to them, but of greater importance, it should have had an explanation by the FBI of why in each case disclosure would result in embarrassment or harassment either to the individual interviewed or to third parties. That explanation also should have addressed, the impact, if any, of the Fineman trial or the Cianfrani Change of Plea Proceedings on the issue of privacy and the extent of the privacy invasion.

■ As we have learned, the Section 7(D) · confidential source exemption requires that an assurance of confidentiality be found for each source. Thus, the district court, in order to find that such assurances, express or implied, were given, had to have been furnished with detailed explanations relat-

ing to each alleged confidential source. In determining whether an assurance of confidentiality had been given, these explanations should have included a discussion of the impact of any subsequent public disclosures made by the source.

The sampling technique by which "representative" documents were furnished to the district · court could not give the district court an appropriate basis on which it could appraise the merits of the government's confidentiality exemption claim for all the documents. The government does not explain in its *in camera* affidavit why it has not analyzed every requested document and furnished the court with an explanation as to its purported exempt status.[11]

Because the government has failed to supply the district court with the explanations necessary under the Act, as we have construed it, and has failed to make available the documents to which those explanations relate, the district court could not properly rule on Lame's request and the government's exemption contentions.

No findings appear in the district court's opinion with respect to the documents actually submitted which can satisfy the 7(C) privacy exemption, because the impact of the Fineman and Cianfrani proceedings are not analyzed. Similarly, the district court opinion makes no findings with respect to express or implied assurances of confidentiality for those documents.[12]

Additionally, the government must provide detailed explanations with respect to the 302s which it did not supply to the court. These explanations must be equally detailed as the explanations which we have required for the sample 302s submitted with the *in camera* affidavit. The government

11. We observe the obvious danger that may be present in a "sampling" case: the government may choose to submit information on "representative" documents for which its claims of exemption are the most persuasive. If the district court wished to examine only a portion of the records, it, not the government, should have chosen the sample.

12. We do not mean to imply that indeed if an exemption is justified, the identity of the 302s must be revealed. The findings to which we

refer can be couched in terms which will still protect the identity of the sources. No individual identification need be given as long as it appears that the documents have been individually examined and analyzed.

We expressly intimate no views with respect to the ultimate decision which the district court may reach after it has been furnished with the explanations and documents necessary for an appropriate *de novo* review.

must also make available to the district court the documents in question.

In sum, therefore, the government must supply an explanation in support of any claimed exemption. Such explanations must be by affidavit and obviously must be examined by the district court. The government must also furnish the original requested documents (here the 302s) to which the explanations refer. It cannot merely furnish samplings of these documents to the district court. The district court, on the other hand, need not make individual examinations of each and every requested document, so long as we are assured that the requested documents have been made available by the agency to the court. The scope and extent of the district court's examination of the requested documents is within its discretion and obviously will be guided by the explanations which appear in the FBI's affidavit.

Once the district court has examined the explanations for the claimed exemptions, it may group its findings by category if it so desires. It need not make repetitive, individual findings as to each claimed exemption if its examination reveals grounds for either exemption or disclosure which are common to more than one document. Our concern here is not with the form or the manner by which the district court's findings are presented. Rather, our concern centers on whether the district court has satisfied the substantive inquiries which Congress has mandated and which we must enforce.

### III.

Our analysis has proceeded on the basis of the legislation as drawn, its legislative history, and the cases which have thus far construed the legislative mandate. Therefore we have been obliged to remand this proceeding to the district court for the reasons which we have heretofore expressed. However, even though the language of the legislation, as well as the cases interpreting it countenance the result reached today, we believe that Congress in enacting FOIA may not have contemplated all the problems to which this case has given rise.

What concerns us particularly is that a law enforcement agency, the FBI, is being required to expend sorely needed resources, not to deal with the burgeoning problem of crime which seriously besets all our citizens, but to devote a large number of hours of exacting labor sorting out affidavits that were collected to apprehend crimes and to prosecute offenders. Moreover, informants, once aware that copies of affidavits submitted to law enforcement agencies can be made public, might be inhibited from future cooperation.

A further concern is that the use of the FOIA, in the fashion employed here, will impose an additional burden on the trial courts that are already overworked. It will make it necessary for them to review large numbers of records, such as had been requested here, *in camera*. And the fact that this procedure will be placed in an adversarial context will further prolong the process and add to its vexatious nature.

Perhaps when Congress is made aware of the problems spawned by the use of the Act which we have identified here and on which Judge Adams has commented in a slightly different context in *Ferri v. Bell*, 645 F.2d 1213, 1226 n.17 (3d Cir. 1981), it will attempt to accommodate the concerns which we have expressed.

### IV.

Because the procedure employed in this case did not result in the district court being furnished with the necessary information essential to its rulings, we cannot approve the manner in which the district court proceeded. This being so we are obliged to reverse the district court's order of July 28, 1980.

The order of the district court of July 28, 1980 will be reversed and the case remanded for proceedings consistent with this opinion.

DUMBAULD, Senior District Judge, concurring and dissenting.

I agree with the accurate and thorough exposition of the statutory provisions [1] contained in Judge Garth's scholarly opinion, and with the conclusion that the case must be remanded to the District Court for further consideration for the reasons that (1) the District Court did not make findings that the information given to the FBI was given under a promise of confidentiality; and (2) that the FBI did not furnish *all* the documents involved to the court for *in camera* examination.

What I disagree with is the specification of standards to be complied with on remand, both by the FBI and the District Court, which to me seem unduly and needlessly burdensome and impracticable.

According to Judge Garth's opinion, the FBI in its affidavit and the District Court in its findings, must deal in detail with *every* document produced for *in camera* examination.[2] The FBI and the District Court are also directed to consider in detail the impact of the subsequent disclosures (in trial testimony or plea-bargain discussions).

In my judgment, treating the second point first, once the finding of confidentiality has been duly made by the District Court, the status of the information so communicated is "fixed in concrete" once for all, and remains exempt from disclosure under FOIA whatever public proclamation of the identical material may be made thereafter. This is well elucidated in Judge Garth's statement that "the subsequent disclosure of information originally given in

confidence does not render non-confidential any of the information originally provided," and by the quotation from Judge Swygert in *Scherer v. Kelley*, 584 F.2d 170, 176 n. 7 (C.A.7, 1978):

> Because a person may have given testimony at a trial on a specific topic does not mean that all information offered by that source upon a guarantee of confidentiality automatically becomes available to the person to whom it relates. The non-testimonial information may be far more damaging than any testimony freely given and may place the source in great peril. A source would be unlikely to testify on any subject if he or she know that by so doing every transcription made by an investigative agent regarding their conversations could be released to the party about whom the source was informing.

To me the nature or extent of the disclosures at trial or plea is utterly irrelevant to the confidentiality *vel non* of communications previously made.

It is of course true that subsequent events may constitute evidence of prior conditions: for example, a later X-ray disclosing the existence of a slowly developing chronic disease may be evidence of the existence of the disease at an earlier time, namely the critical period for entitlement to "black lung" benefits.[3]

However, the likelihood that this rule would be applicable or helpful in determination of the issue of confidentiality *vel non* in the case at bar is extremely unlikely.

---

1. In particular it should be noted that under 5 U.S.C. 552(b)(7)(D) if information is given by a "confidential source," *all* the information from such source is exempt from disclosure (even if the same information is publicly available elsewhere). Moreover, a "confidential source" includes any person giving information in confidence *and is not limited to the "informants"* whose danger from criminals implicated by their "singing" has often been discussed. *Roviaro v. U. S.*, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957).

2. "Each document and its asserted exemption must be individually explained in terms of privacy or confidentiality.... The government

does not explain ... why it has not analyzed *every* requested document *and* furnished the court with an explanation as to its purported exempt status." Garth opinion, p. 928.

3. Conversely, past events or misconduct may be evidence of future unfitness to exercise a profession or office of trust. "Past conduct may well relate to present fitness; past loyalty may have a reasonable relationship to present and future trust." *Garner v. Los Angeles Board*, 341 U.S. 716, 720, 71 S.Ct. 909, 912, 95 L.Ed. 1317 (1951), and other cases cited in Dumbauld, *The Constitution of the United States* (1964) 199–200.

Hence the impact of trial testimony and plea discussions should not be singled out and emphasized as a significant and indispensable element to be considered by the District Court in making its determination on remand.

Of course, if a witness at the trial expressly stated that at no time had he requested or desired confidentiality, this testimony would be given due weight; or if it appeared that a deranged neighbor had gone to the FBI with the specific purpose and hope of spreading defamatory rumors about an acquaintance and exposing him to damaging publicity, the court would give appropriate consideration to that revelation. But in general there seems no justification for requiring particular consideration for trial testimony or plea discussions.

Such material should simply be taken into consideration along with all other circumstances surrounding the communication to the FBI, and the District Court should be free to make its determination of confidentiality *vel non* upon the totality of circumstances.

And, as previously stated, once such a determination of confidentiality at the time of communication has been duly made by the District Court,[4] it is immaterial and irrelevant what publicity anyone may later give to the information thus communicated in confidence: *all* the information communicated by the "confidential source" remains exempt from disclosure under FOIA.

In examining the circumstances surrounding the communication of a public-spirited citizen with the FBI or any other law enforcement agency it should require very little evidence to establish in the ordinary case that the communication was indeed made with a justifiable expectation of confidentiality. A public policy akin to that underlying judicial and prosecutorial immunity[5] should encourage free communication of information helpful to law-enforcement authorities by according protection from annoying unexpected publicity to information thus communicated.[6] *Roviara v. U. S.,* 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957).

Reverting to my first point of disagreement. I believe it is unduly and unnecessarily burdensome and impracticable to trammel the due course of law enforcement and the administration of justice by imposing requirements that both the investigative agency and the reviewing court devote extensive time and effort to the detailed discussion of each document submitted for *in camera* examination.

The situation brings to mind the anecdote about a publisher (perhaps it was Walter Hines Page) to whom an aspiring author submitted a manuscript with a number of pages glued together. When in due time the manuscript was returned with a rejection slip, the author complained that his work had been rejected without a complete reading. The publisher replied: "I do not need to eat an entire egg to know that it is rotten."

Similarly a judge examining *in camera* a mass of documents does not always need to peruse every one of them in its entirety word by word. Often the nature of an item *saute aux yeux* and is evident at a glance. That there has been an "unwarranted invasion of personal privacy" or that confidentiality is clearly intended or implied under the circumstances involved can be seen

---

4. It must be emphasized that in the case at bar the District Judge merely stated that "persons who cooperate with the FBI *often* do so with the expectation that their privacy will be respected" [Italics supplied]. This falls far short of finding that the persons interviewed *in the case at bar* expected confidentiality.

5. *Barr v. Matteo,* 360 U.S. 564, 571, 79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434 (1959), citing Learned Hand in *Gregoire v. Biddle,* 177 F.2d 579, 581 (C.A.2, 1949).

6. While it may be going too far to accept the Bureau's position that such interviews are *always* on a confidential basis, it seems clear that the average citizen would entertain a normal expectation of confidentiality. Perhaps to minimize controversy the Bureau might adopt a policy of reading to all persons interviewed a statement (and having them sign it) similar to the statements regarding *Miranda* rights. It would then be clear, without prolonged debate, whether confidentiality has been claimed or waived.

without elaborate evaluation. Frequently it should suffice for the FBI to state that a document is self-explanatory, without laboring an obvious point; and if a series of documents is infected by an identical ground mandating non-disclosure, it should suffice to list them in categories, without annotations and commentary on each one individually. The same is true of the degree of elaboration required in the District Judge's findings.

Of course it bears repetition that *all* the documents involved must be available for examination by the judge in such detail as he deems necessary; and that *he* and not the FBI, must decide what degree of scrutiny is required in order to illuminate adequately the issues committed to his determination by the terms of the statute and to elucidate with sufficient clarity the grounds of his decision.

Where the enactments of Congress or precedents in the jurisprudence of this Court do not clearly command otherwise, the FBI should be permitted to fight crime by investigating violations of federal law rather than to serve as a librarian to furnish criminals a complete account of the evidence in the government's possession demonstrating their criminality, or to conduct historical research for the benefit of journalists seeking to spread the slime of scandal and sensationalism throughout the land for monetary gain. Similarly the judiciary should be permitted to perform its normal task of adjudicating controversies of importance by the development and application of legal principles rather than to dissipate its energies in file searches through mountainous haystacks of triviality and in unproductive paperwork. These priorities are particularly important in the present era of budgetary constraint when all misspent resources diminish what is available for useful service to the public.

I therefore concur and dissent to the extent indicated above.