**PORTER, Judith R. and Porter, Gerald J., Appellants,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE.**

No. 82–1833.

United States Court of Appeals, Third Circuit.

Argued Aug. 4, 1983.

Decided Sept. 15, 1983.

Raymond J. Bradley (argued), Brian P. Flaherty, H. Robert Fiebach, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellants.

Peter F. Vaira, Jr., U.S. Atty., Philadelphia, Pa., J. Paul McGrath, Asst. Atty. Gen., Leonard Schaitman, Douglas Letter (argued), Attys., Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., for appellees.

Cornish F. Hitchcock, Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., for amicus curiae Freedom of Information Clearinghouse.

Before GIBBONS and HUNTER, Circuit Judges, and MANSMANN,* District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

Judith R. Porter and Gerald J. Porter of Ardmore, Pennsylvania, appeal from a sum-

---

* Hon. Carol Los Mansmann, United States District Judge for the Western District of Pennsyl-vania, sitting by designation.

mary judgment in favor of the Department of Justice in their suit under the Freedom of Information Act, 5 U.S.C. § 552 (1982), to compel disclosure of information about them in the files of the Federal Bureau of Investigation. The trial court granted summary judgment on two grounds: that the Privacy Act, 5 U.S.C. § 552a (1982), is a nondisclosure statute within the meaning of the Freedom of Information Act; and that in any event the material sought is exempt from disclosure under the Freedom of Information Act. We reverse, and remand for further proceedings.

## I.

In March of 1981 Mr. Porter wrote to the FBI Freedom of Information Act Director requesting copies of any files kept on him or his wife. The letter indicated that it was his understanding that the FBI investigated them in 1972. On May 11, 1981, the Chief of the FBI Records Management Division informed them that the central records system at FBI Headquarters in Washington revealed no information indicating that they had ever been subject to investigation by the Bureau. The request was forwarded to the Bureau's Philadelphia Office. On June 4, 1981, that office informed the Porters that a "main" file concerning Judith R. Porter had been located, and that this file contained a reference to Gerald.

The file was referred to FBI Headquarters, which on June 18, 1981, informed the Porters that Judith R. Porter was the subject of a limited security investigation, initiated to determine if any activity on her part constituted a risk to national security. They were also informed that the investigation was closed after it was determined that no such risk existed, and that the file contained a reference to Gerald. Finally, they were told that the file consisted of five pages, all of which was classified pursuant to the national defense and foreign policy

exemption to the Freedom of Information Act.[1]

The Porters filed an administrative appeal to the Office of Privacy and Information Appeals of the Department of Justice, pointing out that it was a total mystery to them what activity they had engaged in could have prompted an investigation of their risk to national security. They requested that if their appeal be denied, the government inform them:

1. On what date was the investigation of Judith R. Porter begun and when was it concluded;

2. What activity or activities of Judith R. Porter prompted the investigation;

3. Do the five pages of classified information contain letters written by Judith R. Porter, transcripts of public statements made by Judith R. Porter, or newspaper reports of her activities;

4. Do the references to Gerald J. Porter pertain to activities in which he engaged or are they simply a mention of the fact that he is the spouse of Judith R. Porter; and

5. At what future date is it anticipated that the file will be declassified?

On September 30, 1981, the Acting Director of the Office of Privacy and Information Appeals ruled:

After careful consideration of your appeal, I have decided to affirm the initial action in this case. The material pertaining to you is classified and I am affirming the denial of access to it on the basis of 5 U.S.C. [§] 552(b)(1). This material, along with a copy of your appeal letter, is being referred to the Department Review Committee to determine whether it warrants continued classification under Executive Order 12065. You will be notified of the Committee's final decision results in the declassification of any information. . . .

---

1. 5 U.S.C. § 552(b)(1) provides:
   This section does not apply to matters that are—(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order; . . . .

The September 30, 1981 letter advised the Porters of their right to seek judicial review of the ruling, and on June 18, 1982 they filed their complaint in this action.

In answer to the complaint the Department of Justice contended for the first time that the Freedom of Information Act did not afford the Porters a remedy, but that the Privacy Act of 1974, 5 U.S.C. § 552a (1982), is their exclusive remedy. The Department contended, as well, that under the Privacy Act the materials sought were exempt from disclosure. Moreover, according to the Justice Department, even if the Freedom of Information Act were to apply to the Porters, the materials would be exempt under 5 U.S.C. § 552(b)(3) (1982), which provides that the Act does not apply to matters

> (3) specifically exempted from disclosure by statute ..., provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;....

According to the Justice Department, section (j)(2) of the Privacy Act, 5 U.S.C. § 552a(j)(2) (1982), is such an exemption statute.

The Porters served interrogatories seeking to learn the basis for the Justice Department's claim of exemption. These the Department refused to answer. Instead it moved for a protective order on which the trial court never ruled. While the motion was pending the Department moved for summary judgment, relying on the affidavit of Special Agent Douglass Ogden. This affidavit was served on the Porters.

The Ogden affidavit recounted the administrative history of Porter's information request and described generally the manner in which the five page file was retrieved. As to the file's contents, Ogden stated:

> One FBIHQ "main" file containing the results of the Philadelphia FBI investigation was located wherein Judith R. Porter was the subject. This file reflected a preliminary investigation initiated to determine if a specific activity of Judith R. Porter constituted a risk to national security. The investigation was predicated upon possible violations of Federal law, including, but not limited to, Title 18, U.S.C., Sections 792 et seq. (Espionage); 2152 et seq. (Sabotage); Title 22, U.S.C., Section 611 et seq. (Foreign Agent Registration Act); and Title 50, U.S.C., Section 401 et seq. (National Security Act of 1947). The investigation was closed after it was determined that no violation of Federal law had occurred and that Judith R. Porter constituted no risk to the national security.

Ogden also stated that the requested records were maintained in the Bureau's Central Record System which has by regulation been exempted from access pursuant to exemption (j)(2) of the Privacy Act, 5 U.S.C. § 552a(j)(2) (1982). He stated further that the file fell within Freedom of Information Act exemption 1, covering national defense and foreign policy materials. Finally, Ogden noted that after the lawsuit began the Bureau had reviewed the file and declassified "a small amount of material." The declassified material was not revealed, however, because in the Department's view the entire file, even though partly declassified, was still covered by Privacy Act exemption (j)(2).

The Porters attempted to depose Agent Ogden, but the Department moved for a protective order, which on October 13, 1982, the trial court granted, pending its *in camera* inspection of the file.

Following the court's order staying Ogden's deposition and ordering the Department to provide the file for its inspection, the Department furnished the court, *ex parte,* with two affidavits of Robert Peterson, a Special Agent in the FBI National Security Affidavits Unit. The Department explained that the first Peterson affidavit, dated September 23, 1982, was intended to serve as a public *Vaughn* index in compliance with *Ferri v. Bell,* 645 F.2d 1213, 1220 (3d Cir.1981), *modified on other grounds,* 671 F.2d 769 (3d Cir.1982), and *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), *cert. de-*

*nied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), but was being withheld from the Porters to avoid the contention that furnishing an affidavit required by the Freedom of Information Act was a waiver of the claimed exemption under the Privacy Act. Since it was relying on the Privacy Act, the Department insisted it had no obligation to furnish a *Vaughn* index.[2] The second Peterson affidavit, dated October 20, 1982, was furnished to assist the Court in its examination of the five page file, which was furnished simultaneously. The second affidavit is not in the record and its contents have not been disclosed.

Peterson's September 23, 1982 affidavit contends that the documents in the file were properly classified under Executive Order 12356 which went into effect in August 1982, because (1) they concerned intelligence activities, sources, or methods, and foreign relations of the United States; and (2) their disclosure could be expected to cause damage to the national security. Peterson segregated out minor portions of the documents that could be declassified under Freedom of Information Act exemption 1. What was declassified was the home address of Mr. and Mrs. Porter, their respective ages, their race, their height, the color of their hair and eyes, and the conclusion, "In view of the above, no further investigation is believed warranted at this time and captioned case is being closed." Every other part of the file, including the dates of the documents, Peterson alleged to be properly classified as exempt from disclosure under Freedom of Information Act exemption 1.

The district court examined the file *in camera* and concluded that the documents had been properly classified under exemption 1 pursuant to an Executive Order. The court also held that, because the Privacy Act exemption applied, the Porters were not entitled to see even those portions of the documents which had been declassified.

Thus summary judgment was entered in favor of the Department.[3]

## II.

The Justice Department, after the Porters appealed to this court, concluded that it would furnish them with copies of one Peterson affidavit, and with copies of the contents of the file, redacted so as to eliminate all material except that referred to above. Pointing to this disclosure, it contends that if we can affirm on the basis of Freedom of Information Act exemption 1 there is no need to reach the broader exemption which it claims under the Privacy Act.[4] Thus our first inquiry is whether we can affirm the summary judgment insofar as it applies to the redacted portions of the documents.

What is immediately apparent from the face of the redacted documents is that they bear classification stamps, with dates and initials, possibly of the classifying officers. The earliest legible date is 5/22/81, but there are a number of later dates, extending through 8/27/82. The classification stamps made in August of 1982 bear the initials RFP, which are, perhaps, those of the affiant Robert F. Peterson. Other initials include rpm, KJ, VRT, and WR. Still others are illegible, and some have been redacted. Peterson's affidavit gives no explanation about the significance of these stamps and initials, or of the identity of the persons whose initials appear. He does not say whether, in exercising his judgment to excise the entire contents of the documents except as noted above, he relied on the judgment of those persons. He does not explain what the significance of their notations is. Thus he does not disclose whether, if the notations have to do with classification, their conclusions and his coincided.

The Peterson September 23, 1982 affidavit sets out in considerable detail the development of a four-symbol exemption 1 code

---

2. See the discussion in Part II, *infra,* on the difference in scope of the claimed exemptions.

3. *See* Porter v. United States Department of Justice, 551 F.Supp. 595, 600 (E.D.Pa.1982).

4. In Provenzano v. Department of Justice, 717 F.2d 799 (3d Cir.1983), argued on the same day as this case, the Privacy Act issue is squarely presented, because no disclosure whatever has been made.

to explain handwritten notations on the face of the redacted version of the documents. The Code is as follows:

(b)(1)C 1 Intelligence Source Contact Dates

(b)(1)C 2 Intelligence Source Singular Identifier/Identifiers

(b)(1)C 3 Information Relating to Intelligence Source Data Collection Capability

(b)(1)C 4 Detailed Information Pertaining to or Provided by an Intelligence Source that Could Reasonably Be Expected to Identify the Source if Disclosed

(b)(1)C 5 Channelization/Dissemination Instructions For Intelligence Source Information

(b)(1)D 1 Information Gathered in the Course of Activity by the United States Aimed at Obtaining Intelligence Information About or From a Foreign Country, Organization, Group or Individual

There are at least forty notations of (b)(1)D 1. There is one notation (b)(1)C 1, three notations (b)(1)C 2, three notations (b)(1)C 3, two notations (b)(1)C 4, and two notations (b)(1)C 5. Thus it appears that only one deletion was required to conceal the date of an intelligence source contact, only three deletions were required to conceal the identity of an intelligence source, only three deletions of information related to intelligence source data collection capability, only two deletions of information might have revealed the identity of an intelligence source, and only two deletions of information related to channelization/dissemination instructions. Moreover in the instances where C 1 through C 4 notations appear, the symbols refer to the same information. Only in three places is information deleted which would allegedly disclose intelligence sources. The vast bulk of the deletions fall into the category "Information Gathered in the Course of Activity by the United States Aimed at Obtaining Intelligence Information About or From a Foreign Country, Organization, Group or Individual."

The Code is a part of an exemption 1 catalog, and that catalog explains that category (b)(1)D 1 deals with the foreign relations or foreign activities of the United States. It describes the information as "Information Gathered in the Course of Activity by the United States Aimed at Obtaining Intelligence Information About or From a Foreign Country, Organization, Group, or Individual." Literally, the category of information includes information completely unrelated to foreign relations, if it happens to have been gathered "in the course of activity by the United States" which is somehow related to intelligence. Perhaps so literal a reading of the catalog is not intended. In discussing the logical nexus between disclosure and damage to national security, however, the catalog states:

This category of information can be sensitive in nature. This condition exists in part due to the delicate nature of international diplomacy. This information must be handled carefully so as not to jeopardize the fragile relationships that exist between the United States and certain foreign governments. It is my judgment that the disclosure of this information could reasonably be expected to impact negatively on United States foreign relations and result in damage to the national security.

There is considerable ambiguity here, and it is not removed by the cross reference at the end of the quoted passage to page Y of the Catalog.[5] Moreover the ambiguity is com-

---

5. That reference states:

The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to, *inter alia:*

(a) Lead to foreign diplomatic, economic and military retaliation against the United States;

(b) Identify the target, scope and time frame of intelligence gathering activities of the United States in or about a foreign country, resulting in the curtailment or cessation of these activities;

(c) Enable hostile entities to assess United States intelligence gathering activities in or about a foreign country and devise countermeasures against these activities;

(d) Compromise cooperative foreign sources, jeopardize their safety and curtail the flow of information from these sources;

pounded when the redacted papers are compared with the Ogden affidavit, which was disclosed to the Porters. While the Ogden affidavit relies on the Justice Department's interpretation of the Privacy Act as affording a blanket exemption for whole systems of records, it actually discloses that Judith Porter was investigated for possible espionage, 18 U.S.C. §§ 792–799 (1976), possible sabotage, 18 U.S.C. §§ 2152–2156 (1976 & Supp. V 1981), and possible violations of the National Security Act of 1947, as amended, 50 U.S.C. §§ 401–426 (1976 & Supp.V 1981). Thus the Peterson affidavit, purporting to furnish a *Vaughn* index in compliance with the concededly narrower nondisclosure provisions of the Freedom of Information Act, actually discloses less about the contents of the file than the Ogden affidavit on which the Justice Department relies for the broader Privacy Act exemption which it claims.

█ We recognize that there is tension between the discovery provisions of the Federal Rules of Civil Procedure and the Freedom of Information Act exemptions from disclosure. But we have held, along with most courts which have considered the issue, that Congress did not intend to leave a requester "helpless to contradict the government's description of information or effectively assist the trial judge." *Ferri v. Bell,* 645 F.2d 1213, 1222 (3d Cir.1981). Had the Peterson *Vaughn* index been disclosed, counsel would have been able to raise the questions about it which we have noted above. The trial court could then have considered the appropriateness of limited discovery such as has been ordered by some courts. *See, e.g., Stein v. Department of Justice,* 662 F.2d 1245, 1253 (7th Cir.1981); *Phillippi v. Central Intelligence Agency,* 546 F.2d 1009, 1013, 1014 n. 12 (D.C.Cir.1976); *Schaffer v. Kissinger,* 505 F.2d 389, 391 (D.C.Cir.1974); *Murphy v. Federal Bureau of Investigation,* 490 F.Supp. 1134, 1136

(D.D.C.1980). Consideration of some discovery would appear to be particularly appropriate in this instance, in which the Porters allege that the only investigation took place over a decade ago, while the classification stamps were placed on the documents only after their March 1981 request. The Peterson affidavit, and the redacted documents, demonstrate the need for further inquiry. A summary judgment that Freedom of Information Act exemption 1 applies is inappropriate. Fed.R.Civ.P. 56(f).

### III.

Since we have concluded that the summary judgment cannot be affirmed on the authority of exemption 1 of the Freedom of Information Act, we must consider the Justice Department's alternative position that the Privacy Act authorizes nondisclosure. Section 3 of that Act added to Title 5 of the United States Code, section 552a.

#### A. The Justice Department:
#### Interpretation of the Privacy Act

The Department's position depends upon the interrelationship of three subsections of section 552a. The first provides:

> No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—
>
> (2) required under section 552 of this title [the Freedom of Information Act];....

5 U.S.C. § 552a(b) (1982). This subsection implements the basic policy of the Privacy Act, announced in the legislative findings, of safeguarding constitutionally recognized individual privacy rights.[6] It prohibits dis-

---

(e) Endanger citizens of the United States who might be residing or traveling in the foreign country involved;
resulting in damage to the national security.

**6.** In Section 2(a) of the Privacy Act Congress found that:

(1) the privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by Federal agencies;
(2) the increasing use of computers and sophisticated information technology, while essential to the efficient operations of the Government, has greatly magnified the harm

closure of the contents of systems of records [7] pertaining to individuals except with their consent, unless the disclosure falls in one of eleven separate categories. The second exception is disclosure mandated by the Freedom of Information Act. The plain language of section 552a(b)(2) is that the prohibition on disclosure in the Privacy Act is inapplicable to Freedom of Information Act requests. The Department of Justice concedes that this is so with respect to a Freedom of Information Act request made by anyone in the world other than the individual who is identified in a system of records.

The second relevant subsection provides:

Each agency that maintains a system of records shall—

(1) upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him ... to review the record and have a copy made of all or any portion thereof in a form comprehensible to him, ...;

(2) permit the individual to request amendment of a record pertaining to him...;

(3) permit the individual who disagrees with the refusal of the agency to amend his record to request a review of such refusal ....

5 U.S.C. § 552a(d) (1982). Section 552a(d) implements the congressional policy of minimizing harm to individuals flowing from the maintenance of inaccurate information about them in a system of records which even under the strictures of section 552a(b) may be disseminated to eleven categories of recipients. This access provision is relevant

to the instant case because it is the Justice Department's position that it is a *pro tanto* repeal of the Freedom of Information Act. The Department concedes that until the Privacy Act individuals could, under the Freedom of Information Act, gain access to records pertaining to themselves, subject only to the exemptions contained in that statute. It now urges, contrary to the position it took until sometime late in 1981, that section 552a(d) of the Privacy Act eliminated that Freedom of Information Act right, and became, for individuals, the sole means of access to records pertaining to themselves. That being the case, the Department urges, the exception in section 552a(b)(2), preserving access through the Freedom of Information Act, should be read as applicable to every requester in the world except the individual named in a system of records.

The third Privacy Act subsection on which the Department of Justice relies provides:

The head of any agency may promulgate rules ... to exempt any system of records within the agency from any part of this section except subsection (b), (c)(1) and (2), (e)(4)(A) through (F), (e)(6), (7), (9), (10) and (11), and (i) if the system of records is—

(2) maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws ....

5 U.S.C. § 552a(j)(2) (1982); see also 5 U.S.C. § 552a(k)(2) (1982). The Department of Justice has adopted regulations pursuant to section 552a(j)(2), exempting

to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information;

(3) the opportunities for an individual to secure employment, insurance, and credit, and his right to due process, and other legal protections are endangered by the misuse of certain information systems;

(4) the right to privacy is a personal and fundamental right protected by the Constitution of the United States; and

(5) in order to protect the privacy of individuals identified in information systems maintained by Federal agencies, it is neces-

sary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies.

Privacy Act of 1974, Pub.L. No. 93–579, § 2(a), 88 Stat. 1896, 1896.

7. 5 U.S.C. § 552a(a)(5) (1982) provides:

[T]he term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual; ....

the entire Central Record System of the FBI. 28 C.F.R. § 16.96 (1982). Since the listing of exceptions in section 552a(j) does not include section 552a(d), it is the Department's position that by the adoption of these regulations the files of the FBI are totally exempt from disclosure to a section 552a(d) requester. That being the case, there is no need to furnish a *Vaughn* index to any such requester or to disclose non-sensitive portions of records.

It is not the Department's position that promulgation of 28 C.F.R. § 16.96 (1982) created a blanket Freedom of Information Act exception for FBI files. That position would be inconsistent with the plain language both of section 552a(b)(2) and of other parts of the Privacy Act such as section 552a(c)(1), which unequivocally contemplate the continued operation of the Freedom of Information Act.[8] Rather, the Department's reliance on section 552a(j) depends entirely upon its contention that section 552a(d) was a *pro tanto* repeal of the Freedom of Information Act, by making section 552a(d), for individuals, the sole means of access to records in which they are mentioned. It concedes that any third party could, under the Freedom of Information Act, and subject to its specific exemptions, gain access to the same records. It concedes, moreover, that a corporation or partnership could obtain information about itself under the Freedom of Information Act.

### B. The Porters' Request

█ The initial request, signed by Mr. Porter alone, read "Please send me a copy of any file you have on me or my wife—Judith Porter." The government's responses establish that there is no file on Mr. Porter. Thus, *prima facie*, we are dealing with a third-party request by Porter for a file on Mrs. Porter. In their complaint, however, the Porters allege that "[O]n March 18, 1981, pursuant to the Freedom of Information Act ('FOIA'), Mr. and Mrs. Porter requested that a search of the records of the Federal Bureau of Investigation for material pertaining to either of them be undertaken and that any such material be released to them." The Department of Justice would have us construe the request by Porter as having been made by both Porters, each for his or her own file. We do not think the quoted allegation in the complaint can fairly be so construed. The complaint relies solely on the Freedom of Information Act, and was drafted before the Porters were informed of the Department's contention that the Freedom of Information Act was inapplicable to first-party requests. Thus it would be fundamentally unfair to rely on the wording of the complaint to convert Mr. Porter's third-party request for the contents of the file on his wife into a first-party request.

The Department of Justice points out that in response to its form letter both of the Porters, on April 22, 1981, furnished written consent to the release of any documents in the FBI files pertaining to them. This was done in response to a sentence in the form letter:

> Before we can commence processing your request for records pertaining to another individual, we must know whether you have been authorized by that individual to receive these documents. It will be necessary for you to submit to the FBI the original of a written authorization which has been duly attested by a Notary Public.

Clearly the most that can be read into the Porters' April 22, 1981 response is that each was consenting to the release to the other of information in his or her own file. The response is entirely consistent with the position that Porter was pursuing a third-party request for the contents of his wife's file.

Finally, the Department of Justice urges that a husband's request for examination of the contents of his wife's file should be treated as a sham third-party request. Certainly we are not prepared to hold that this is so in every case as a matter of law, for no authority has been cited to us in support of so extraordinary a proposition. Arguably some ostensible third-party requests might

---

**8.** Section 552a(c)(1) excepts from the accounting requirements of the Privacy Act disclosures

made under subsection (b)(2), that is, pursuant to the Freedom of Information Act.

as a matter of fact be made on behalf of a first-party requester. But the issue would be factual. In the summary judgment record before us, however, neither the Ogden affidavit which was revealed to the Porters nor the Peterson affidavit which was not revealed until appellees' brief was filed, suggests that the third-party request was a sham. The trial court, moreover, made no reference to the question whether Mr. Porter's request for his wife's record was a sham.

Thus on this record, even assuming that the Justice Department correctly construes section 552a(d) as a *pro tanto* repeal of the Freedom of Information Act, the summary judgment in its favor cannot stand. We are dealing with what on its face is a third-party rather than a first-party request. The Department concedes that the Freedom of Information Act applies to third-party requests.

### C. The Proceedings on Remand

The Justice Department's position that Porter's request for the file on his wife may be a sham suggests that there will be further proceedings in an attempt to establish as much factually. That effort would involve the parties and the court in further time-consuming and expensive proceedings, proceedings which would be entirely fruitless if the Justice Department's contention that section 552a(d) is the exclusive access route for first-party requesters were to be rejected. Thus even though on the Department's own interpretation of the Privacy Act summary judgment cannot stand, it is appropriate to address the merits of that interpretation.[9]

Thus far three courts of appeals have considered the question whether the Privacy Act bars first-party access under the Freedom of Information Act to entire systems of records exempted by agency action.

The first is *Terkel v. Kelly,* 599 F.2d 214 (7th Cir.1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980), in which without analysis the court simply stated the result.[10] The second is *Painter v. Federal Bureau of Investigation,* 615 F.2d 689 (5th Cir.1980), in which the court, without analysis, relied on *Terkel v. Kelly. Id.* at 691 n. 3. It was not until the Court of Appeals for the District of Columbia Circuit decided *Greentree v. United States Customs Service,* 674 F.2d 74 (D.C.Cir.1982), that any appellate court made a searching analysis of the interrelationship between the two statutes.

In *Greentree* the district court had held that section 552a(j) exemptions were "specifically exempted from disclosure by statute" within the meaning of section (b)(3) of the Freedom of Information Act, 5 U.S.C. § 552(b)(3) (1982). The court so held despite the fact that the Department of Justice did not agree with that interpretation. *Greentree v. United States Customs Service,* 515 F.Supp. 1145, 1148 (D.D.C.1981). On appeal the Justice Department changed its position. That change in position prompted Judge Wald to write extensively on the text and legislative history of the Privacy Act, and to conclude that the Department was simply wrong. We find Judge Wald's analysis entirely persuasive. No point would be served by duplicating it. We do, however, deem it appropriate to make some additional observations.

First, the text of the Privacy Act lends no real support to the Justice Department's interpretation. Section 552a(j) and section 552a(k) which authorize agencies to promulgate exemptions for systems of records both refer to exemptions only "from any part of this section." The plain language refers only to exemptions from the provisions of section 552a, not to any other section in Title 5, nor to any other disclosure statute.

---

9. *See* note 4 *supra.*

10. The *Terkel* court's analysis consists of this sentence:
> Although the Freedom of Information Act does not contain a comparable exemption [to section 552a(k)(5) ], we agree with the lower court that the two statutes must be read together, and that the Freedom of Information Act cannot compel the disclosure of information that the Privacy Act clearly contemplates to be exempt.

599 F.2d at 216. No mention is made of 5 U.S.C. § 552(b)(2) (1982).

Had Congress intended to authorize the creation by regulation of exemptions from the Freedom of Information Act it would have used language such as "this title" rather than "this section." Moreover the language in section 552a(b)(2) could hardly be clearer. This nondisclosure provision expressly excepts disclosures required under the Freedom of Information Act. The language Congress chose in section 552a(b)(2) of the Privacy Act simply cannot be tortured so as to convey an intention to repeal it in part. The Justice Department's contention that section 552a(b)(2) refers only to third-party requests is not apparent on the face of the statute. Even if it were to be so read, however, that reading would not support the inference that the section repeals any part of another statute. At most it would support the inference that for first-party requesters a request is the equivalent of consent.[11] Thus the Justice Department's entire construction depends on the language of the Privacy Act access provision, section 552a(d). There is not a word in that section suggesting that the special remedy which it provides for the vindication of the privacy rights which Congress identified in its legislative findings was to be exclusive of all other rights which the law might elsewhere provide.

■ Since nothing in the language of section 552a(d) can be read as an express *pro tanto* repeal of the Freedom of Information Act, the Justice Department's effort must be considered as an attempt to find a *pro tanto* repeal by implication. The proponent of such a proposition is faced with the formidable barrier of the settled rule of statutory construction to the contrary. "It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored." *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 168, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976). An implied repeal will be found " '(1) where provisions in the two acts are in irreconcilable conflict, . . . and (2) if the latter act

covers the whole subject of the earlier one and is clearly intended as a substitute . . . .' " *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976) (citing *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936)). That standard is not satisfied here. The Privacy Act and the Freedom of Information Act are perfectly reconcilable by reading the special remedy in section 552a(d) as serving to vindicate privacy interests in a special manner, while leaving standing the preexisting Freedom of Information Act remedy providing access to information for its own sake. Moreover the Privacy Act expressly states that it is not intended as a substitute for the Freedom of Information Act. Indeed its basic thrust is in an opposite direction. To a large extent, though not entirely, it is designed to discourage rather than encourage disclosure of information impinging upon the privacy of individuals. Given the strict rule against repeals by implication, a legislative intent to accomplish such a repeal in this instance would have to appear in the legislative history with overwhelming clarity. There is no such clarity.

There is a certain amount of ambiguity in the legislative history of the Privacy Act, with statements by members of Congress in which each side purports to find support. That legislative history is reprinted in Staff of Senate Comm. on Gov't Operations & House Comm. on Gov't Operations, Subcomm. on Gov't Information and Individual Rights, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974, S. 3418 (Public Law 93–579), Source Book on Privacy (Joint Comm. Print 1976) [Source Book]. The Source Book reveals that the ambiguities arose primarily because the Senate and the House of Representatives adopted separate bills, S. 3418 introduced by Senator Ervin and H.R. 16373 introduced by Congressman Moorhead. *Id.* at 9,239. Each bill was amended in the chamber in which it originated. Eventually each chamber re-

---

**11.** Reference to exemption 3 of the Freedom of Information Act therefore adds nothing to the analysis. The Privacy Act is an exemption

statute only if one accepts the proposition that section 552a(d) is the exclusive means of first-party access.

jected the bill passed by the other. Finally, shortly before the December 31, 1974 recess, a compromise bill was adopted, which included the provision in section 552a(b)(2), permitting disclosure, without the consent of an individual named therein, of records the disclosure of which was required by the Freedom of Information Act. *Id.* at 502. An equivalent provision had been included in the original H.R. 16373, but was deleted by the House Committee on Government Operations. *Id.* at 242–43, 279–80. Although the language of section 552a(b)(2) had not been a part of S. 3418, the Senate Bill as reported from the Committee on Government Operations did provide in section 205(b) that "[n]othing in this act shall be construed to permit the withholding of any personal information which is otherwise required to be disclosed by law or any regulation thereunder." *Id.* at 143. The intermediate version of H.R. 16373 as approved by the House Committee arguably would have applied Privacy Act exemptions to all Freedom of Information Act requests, while S. 3418 would have confined those exemptions to Privacy Act obligations. The compromise bill, restoring the original language of H.R. 16373, was obviously intended to adopt the policy embodied in section 205(b) of S. 3418, which applied to both first-party and third-party requests. The report accompanying the compromise bill notes:

> The Compromise amendment would add an additional condition of disclosure to the House bill which prohibits disclosure without written request of an individual unless disclosure of the record would be pursuant to Section 552 of the Freedom of Information Act. This compromise is designed to preserve the status quo as interpreted by the courts regarding the disclosure of personal information under that section.

Source Book, *supra,* at 861. Thus, as noted by the *Greentree* court, *see Greentree, supra,* 674 F.2d at 81, the enacted version of the Privacy Act reflects the successful effort to keep separate the exemptions in the Privacy Act and the Freedom of Information Act.

■ We have searched the legislative history of all versions of S. 3418, H.R. 16373, and the compromise bill, which was enacted, and we have found nothing which suggests that Congress intended Privacy Act section 552a(d) to be a partial repeal of the Freedom of Information Act by making it the sole means of access for first-party information. The construction of the Privacy Act for which the Department of Justice contends depends, ultimately and completely, on clear evidence of such an intention. In no other manner can the "this section" language of section 552a(j) and (k) be stretched so as to apply to Freedom of Information Act requests made by first parties. Thus the legislative history of the Privacy Act utterly fails to overcome the presumption against repeals by implication.

■ Nor can the Department of Justice rely on any supposed expertise with respect to the statute it is charged with administering. In the first place, as the *Greentree* court points out, that department's interpretation of the statute has vacillated. *Greentree, supra,* 674 F.2d at 84–85. Moreover, the Justice Department is not the only federal agency with obligations under the Privacy Act. Under section 6 of the Privacy Act, the Office of Management and Budget is charged with the responsibility for developing guidelines and regulations for the Act's implementation by government agencies. Privacy Act of 1974, Pub.L. No. 93–579, § 6, 88 Stat. 1896, 1909. Since 1975 those guidelines have provided:

> In some instances under the Privacy Act an agency may (1) exempt a system of records (or a portion thereof) from access by individuals in accordance with the general or specific exemptions (subsection (j) or (k)); or (2) deny a request for access to records compiled in reasonable anticipation of a civil action or proceeding or archival records (subsection (d)(5) or (1)). In a few instances the exemption from disclosure under the Privacy Act may be interpreted to be broader than the Freedom of Information Act (5 U.S.C. 552). In such instances the Privacy Act should not be used to deny

access to information about an individual which would otherwise have been *required* to be disclosed to that individual under the Freedom of Information Act.

.  .  .  .  .

It is our view that agencies should treat requests by individuals for information pertaining to themselves which specify either the FOIA or the Privacy Act (but not both) under the procedures established pursuant to the Act specified in the request. When the request specifies, and may be processed under, both the FOIA and the Privacy Act, or specifies neither Act, Privacy Act procedures should be employed. The individual should be advised, however, that the agency has elected to use Privacy Act procedures, of the existence and the general effect of the Freedom of Information Act, and of the differences, if any, between the agency's procedures under the two Acts (e.g., fees, time limits, access and appeals).

The net effect of this approach should be to assure the individuals do not, as a consequence of the Privacy Act, have less access to information pertaining to themselves than that they had prior to its enactment.

40 Fed.Reg. 56742–43 (1975). Thus the contemporaneous interpretation of the Privacy Act by an agency charged by Congress with specific responsibility for the development of guidelines and regulations for the Act's implementation is entirely consistent with the interpretation which the Justice Department formerly embraced. According to the Justice Department (*see* Brief at 35), the Office of Management and Budget is now considering a revision of those guidelines. That does not alter the value of the extant guidelines as a reflection of the contemporaneous understanding of the agency as to the intention of the ninety-third Congress. *See Greentree, supra,* 674 F.2d 74, 85 & n. 28.

We conclude, therefore, that the trial court erred in holding that the Privacy Act was the sole means of access for individual records and that the systems of records

exemption of 5 U.S.C. § 552a(j)(2) (1982) applied to an individual Freedom of Information Act request. Thus the *Vaughn* index should have been disclosed to the requesters, and the procedures mandated by *Ferri v. Bell,* 645 F.2d 1213, 1220 (3d Cir. 1981), followed.

IV.

The summary judgment in favor of the Department of Justice will be reversed, and the case remanded for further proceedings consistent with this opinion.